IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MICHAEL D. GIBBONS,
    *Plaintiff*

v.

JOHN C. MALONE, *et. al.*,
    *Defendant*

**Case:** 10-Civ-8640 (BSJ/MHD)

PLAINTIFF'S BRIEF IN OPPOSITION TO DEFEDANT'S MOTION TO DISMISS

PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFEDANT'S MOTION TO DISMISS

In opposition to defendant John C. Malone's ("Malone") motion to dismiss[1] under FED. R. CIV. P. 12(b)(6), his proposed order, and the Joinder filed by Discovery[2] plaintiff submits the following brief.

**Contents**

**Overview** . . . . . . . . . . . . . . . . 1

**Standard for Dismissal** . . . . . . . . . . . . . 1

**Facts** . . . . . . . . . . . . . . . . . 2

    (A) Malone's Insider Status and Transactions . . . . . 2

    (B) Legal Characteristics of Discovery's Voting and Non-Voting Common Stock . . . . . . . . . . . . 3

**Points and Authorities** . . . . . . . . . . . . 5

POINT I     Section 16(b), by its own language, subjects purchases and sales of "any" equity securities by an insider to its provisions. . . 5

POINT II     The only case to consider the question of cross-class matching under Section 16(b) determined that it is allowed if both securities were "equity securities" . . . . . . . . . . 8

---

[1] DOCKET DOCUMENT NO. 13..
[2] DOCKET DOCUMENT NO. 14..

POINT III	The prices of Discovery's voting and non-voting stock are so highly correlated that an insider's knowledge of the future price prospects of one of them provides the insider with a high degree of information about the future price prospects of the other. . . . . . . . . . . . . . . . . . . .	10

POINT IV	Permitting short-swing trading between voting and non-voting common stock would make evasion of Section 16 trivially easy.	11

**Conclusion** . . . . . . . . . . . . . . . . . . .	**13**

**Certificate of Service** . . . . . . . . . . . . . . . . .	**14**

# Table of Authorities

**United States Supreme Court**

1. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).
2. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).
3. *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973).
4. *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418 (1972).

**Second Circuit**

5. *Goldstein v. QVT Associates GP LLC et al*, FED. SEC. L. REP. ¶95,937 (S.D.N.Y. 2010).
6. *York v. Association of the Bar of the City of New York*, 286 F.3d 122 (2d Cir. 2002).
7. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000).
8. *Leonard v. Israel Bank of New York*, 199 F.3d 99 (2d Cir. 1999).
9. *Gwozdzinsky ex rel. Revco D.S. v. Zell/Chillmark Fund, L.P.*, 156 F3d 305 (2d Cir. 1998).
10. *Chemical Fund, Inc. v. Xerox Corp.*, 377 F.2d 107 (2d Cir. 1967).
11. *Ellerin v. Massachusetts Mutual Life Ins. Co.*, 270 F.2d 259 (2d Cir. 1959).
12. *Smolowe v. Delendo Corporation*, 136 F.2d 231 (2d Cir. 1943).

**Other Circuits**

13. *ConocoPhillips Co. v. EPA*, 612 F.3d 822 (5th Cir. 2010).
14. *Levy v. Sterling Holding Co.*, 544 F.3d 493 (3rd Cir. 2008).
15. *Gund v. First Florida Banks, Inc*, 726 F.2d 682 (11th Cir. 1984).

**Western District of New York**

16. *Chemical Fund, Inc. v. Xerox Corp.*, FED. SEC. L. REP. ¶¶91,653 (W.D.N.Y.1966).

**United States Code**

17. 15 U.S.C. §78c(a)(11) (Exchange Act Section 3(a)(11)).
18. 15 U.S.C. §78p (Exchange Act Section 16).

**Code of Federal Regulations**

19. 17 C.F.R. §240.16a-1 (Rule 16a-1).

20. 17 C.F.R. §240.16b-6(c)(2).

**Securities and Exchange Commission**

21. SEC Release No. 34-18114, *Rules Applicable to. Insider Reporting and Trading*, 46 Fed. Reg. 48147 (Oct. 1, 1981).

22. 10 SEC Annual Report 50 (1944).

**Congressional Record**

23. H.R. Rep. No. 138, 73rd Cong., 2d Sess. 13, (1934).

**Other**

24. P. Romeo and A. Dye, SECTION 16 TREATISE AND REPORTING GUIDE (E.P. Executive Press, Inc. 2004).

25. Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (West 2000).

26. S. Gawiser and G. Witt, A JOURNALIST'S GUIDE TO PUBLIC OPINION POLLS (Praeger, 1994).

## Overview

Section 16(b)[3] of the Exchange Act requires that statutory insiders of an issuer of publicly-traded securities return to the issuer any profit from the purchase and sale (or a sale and purchase, order does not matter) any of the company's equity securities within any period of less than six months. In this case, the defendant, John C. Malone ("Malone"), who is a director and a substantial stockholder of Discovery Communications, Inc. ("Discovery"), engaged in a series of purchase and sales of the Discovery common stock during December, 2008. He sold shares of non-voting common stock and bought shares of voting common stock. This case presents the Court with two issues:

- Are sales and purchases of voting and non-voting common stock matchable against one another for purposes of the short-swing trading provisions of Section 16(b)? and

- If so, how is the profit to be measured?

Plaintiff believes that, for sound statutory and policy reasons, transactions in voting and non-voting common stock should be matchable with one another for purposes of Section 16(b) and that the profit should be measured by reference to the prices of the non-voting common stock, which eliminates the value of the vote from the calculation, making the prices of the two stocks commensurate. In ruling on defendant's motion, however, only the first question need be addressed by the Court, since the manner of measuring profit is not determinative of *whether* plaintiff has stated a cause of action, only the extent of short-swing profit.

## Standard for Dismissal

Plaintiff generally agrees with Malone's statement of the legal standard but wishes to emphasize a few points. In a motion to dismiss for failure to state a cause of action under Rule 12(b)(6), the court may consider any written instrument attached to or incorporated by reference into the complaint, any public disclosure documents filed with the SEC, any documents possessed by and known to the plaintiff in bringing the suit.[4] In addition, the Court may consider any facts of which it may take judicial notice.[5]

The Supreme Court has recently clarified its view of the standard for dismissal under Rule 12(b)(6),[6] in two respects:

---

[3]15 U.S.C. §78p(b).
[4]*Goldstein v. QVT Associates GP LLC et al*, FED. SEC. L. REP. ¶95,937 (S.D.N.Y. 2010).
[5]*Leonard v. Israel Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999).
[6]*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

> First, the tenet that a court must accept as true all the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.
>
>         \*      \*      \*      \*
>
> Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will $\cdots$ be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.[7]

These qualifications leave intact the requirement that the "well-pleaded," i.e. non-conclusory, facts set out in the complaint be accepted as true. In this case, plaintiff's complaint sets forth a detailed recital of facts that, together, constitute all the elements required for a short-swing profit cause of action. None of facts are conclusory or mere "recitals of the elements." They are, rather, taken from Malone's public filings with the SEC. Therefore, applying the standard, plaintiff has "alleged facts that confer a judicially cognizable right of action."[8]

### Facts

**(a)  Malone's Insider Status and Transactions**

The relevant facts of this case are quite simple and set forth in the complaint.[9] During December, 2008, Malone was a director[10] and a more-than-10% holder[11] of a class of Discovery's common stock. Between December 5 and December 17, 2008, he personally or through a trust that he controlled,[12] engaged in a series of sales of Discovery non-voting common stock and a series of purchases on Discovery voting common stock.[13] Both the voting and non-voting common stock are equity securities of Discovery.[14] Some of the sales were at a per-share price higher than some

---

[7]*Iqbal* at 1949.

[8]*York v. Association of the Bar of the City of New York*, 286 F.3d 122 (2d Cir. 2002).

[9]DOCKET DOCUMENT NO. 1. hereinafter the"complaint".

[10]COMPLAINT ¶27. Malone so designated himself on at least nine Form 4s filed with the SEC during December, 2008, under penalty of criminal sanctions for intentional misstatements.

[11]COMPLAINT ¶26. According to his Schedule 13D filed on September 17, 2008, during the period relevant to this action, Malone owned (a) just under 1% of the Series A voting common stock, (b) over 90% of the Series B common stock, and (c) a bit over 5% of the Series C non-voting common stock.

[12]COMPLAINT ¶29–32.

[13]COMPLAINT ¶¶33–41 sets forth the transactions in detail, and Schedule II to the Complaint summarizes them in tabular form. All of these transactions are taken from reports on Form 4 filed by Malone during December, 2008, under penalty of criminal sanction for intentional misstatements.

[14]COMPLAINT ¶¶21-23.

of the purchases,[15] ensuring that, under any standard, the transactions resulted in a profit. Taken together, these facts set forth a prima facia cause of action against Malone for disgorgement of short-swing profits under Section 16(b).[16]

*(b)  Legal Characteristics of Discovery's Voting and Non-Voting Common Stock*

Discovery has three series of its class of common stock, designated by its articles as Series A, Series B,[17] and Series C. Malone's transactions only involved the Series A common stock and Series C common stock. Unless the class designation is otherwise important, this brief will refer to them simply as "voting common stock" (Series A) and "non-voting common stock" (Series C). Discovery also has outstanding a separate class of preferred stock, not involved in this case.

The respective rights and privileges of the stocks are set out in Article IV, Section B, of Discovery's articles of incorporation, the relevant portions of which are attached to the complaint as Exhibit A.[18] The second full paragraph of that section provides for the general equality of all three classes:

> Each share of Series A Common Stock, each share of Series B Common Stock and each share of Series C Common Stock shall, except as otherwise provided in this Article IV, Section B, *be identical in all respects* and shall have *equal rights, powers, and privileges*.[19]

Paragraph 1 of Article IV, Section B, provides that the voting rights of the respective shares of stock are:[20]

- 1 vote per share for Series A, the voting common stock,

- 10 votes per share for Series B common stock, and

- 0 votes per share for Series C, the non-voting common stock, except in circumstances where state law requires them to be allowed a vote, in which case, they are entitled to $\frac{1}{100}$ vote per share.

The remainder of Section B, though lengthy, is not difficult to summarize. Paragraph 2 provides for Series B shares to be convertible into Series A shares, along with provisions for the mechanics of conversion.[21] Paragraph 3 provides that all

---

[15]For example, Schedule II to the Complaint shows (1) a sale of 70,000 shares of non-voing stock on December 8, 2008, at $13.97 per share (Ref line **003**) and (2) a purchase of 40,000 shares of voting common stock on December 15, 2008, at $12.89 per share (Ref line **016**).

[16]*See*, *Gwozdzinsky ex rel. Revco D.S. v. Zell/Chillmark Fund, L.P.*, 156 F3d 305 (2d Cir. 1998).

[17]According to his Schedule 13D filed on September 17, 2008, during the period relevant to this action, Malone owned over 90% of the Series B common stock.

[18]COMPLAINT A-2 to A17.

[19]*Id*. at A-13.

[20]*Id*.

[21]*Id*. at A-13 to A-15.

3

dividends, other than certain stock dividends, *must be equal* on a per-share basis for all classes of stock,[22] and paragraph 4 ensures that the 10-1 voting advantage of the Series B stock is not diluted by stock dividends or other share distributions without the consent of the Series B holders.[23] Paragraph 5 similarly prevents reclassifications from changing the relative rights of the three series of common stock.[24] Finally, Paragraph 6 provides for the *equal pro-rata treatment* of all shares of common stock on liquidation, after any preferred stock liquidation preferences have been paid.[25]

Thus, while the voting and non-voting stocks differ with respect to *governance* rights, Discovery's articles guarantee them economic parity: they are guaranteed parity in the right to share in Discovery's *income* through dividends, and they are guaranteed parity in the right to share in Discovery's *assets* in liquidation.

In his brief,[26] Malone makes much of the fact that the voting, but not the non-voting, stock can receive stock dividends of voting stock. While this is true, it is misleading. In a stock dividend, the non-voting stock would not be entitled to a distribution of *voting* stock, but it would be entitled to an equivalent stock dividend of *non-voting stock*.[27] This is simply an aspect of their differing governance rights, and is designed to keep stock dividends from altering the proportion of voting rights held by each of the series of common. This provision does not, however, grant any *economic* rights to the voting stock that are not also granted to the non-voting stock. Thus, share distributions cannot alter the relative proportions of the equity claim that each share enjoys on the income and assets of Discovery, and it would be alarming—to the holders of non-voting common anyway—if they could.

---

[22]*Id.* at A-13.
[23]*Id.* at A-15 to A-17.
[24]*Id.* at A-17.
[25]*Id.*
[26]DEFENDANT MALONE'S MEMORANDUM IN SUPPORT at 3.
[27]Paragraph 4(a) of Article IV, Section B, of Discovery's articles provides for "only" two ways to declare a share distribution (i) distribution of non-voting stock to all stockholders on an equal per-share basis or (ii) distribution to holders of each series of shares of the same kind on an equal per-share basis. *See* COMPLAINT at A-15. This also comports with the description of share distributions given to shareholders on page 58 of Discovery's Form S-4 registration statement filed June 11, 2008, in connection with the merger transaction that resulted in the company's current ownership structure.

**Points and Authorities**

### POINT I.
### SECTION 16(B), BY ITS OWN LANGUAGE, SUBJECTS PURCHASES AND SALES OF "ANY" EQUITY SECURITIES BY AN INSIDER TO ITS PROVISIONS.

Any question about whether Section 16(b)[28] contemplates matching of trades in voting and non-voting common stock must start with the language of the statute. Section 16(b) reads in relevant part as follows:

> (b) For the purpose of preventing the unfair use of information which may have been obtained by [an insider] · · ·, any profit realized by him from any purchase and sale, or any sale and purchase, of *any equity security* of such issuer · · · within any period of less than six months · · · shall inure to and be recoverable by the issuer · · · .[29]

Had Congress intended to limit the scope of the statute in the manner defendants suggest, it could have said "any equity security of the same class." But it didn't. And it is not as though the drafters of the statute did not have the notion of "classes" close at hand. Section 16(a) defines insiders to include, besides officers and directors, "every person who is directly or indirectly the beneficial owner of more than 10 percent of *any class of equity security*."[30] As written, Section 16(b) applies to any "equity security." Section 3(a)(11) of the Exchange Act defines an "equity security" to mean "any stock or similar security" as well as securities convertible into an equity security and warrants and rights to an acquire an equity security.[31] The definition imposes no requirement that a security have a right to vote in order to be an "equity security," and Discovery's voting and non-voting common both clearly fall within the statutory definition.

Malone has argued in his brief that the statutory language means that the "equity security" that is the subject of the "purchase" and "sale" must be the same class of equity securities.[32] In support, he cites a Fifth Circuit[33] EPA case in which the court rejected the argument that in the phrase "the location, design, construction, and capacity of cooling water intake structures," the "location" referred to something other than[34] the "cooling water intake structures." The court noted that the "postmodifying prepositional phrase"—in that case "of cooling water intake

---

[28] 15 U.S.C. §78p(b) *et. seq.*. Throughout the following, a reference to a "Section XX" will be a reference to section numbers of the Exchange Act, using its section numbers.

[29] 15 U.S.C. §§78p(b) (emphasis added).

[30] 15 U.S.C. §§78p(a) (emphasis added).

[31] 15 U.S.C. §78c(a)(11). The definition is quoted in full below on page 9.

[32] DEFENDANT MALONE'S MEMORANDUM IN SUPPORT at 8–9.

[33] *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 838–839 (5th Cir. 2010).

[34] ConnocoPhillips was arguing that the "location" but not the other items referred to the facility serviced by a water intake rather than the intake itself. *Id.*

structures"—when following a list joined by a coordinating conjunction—in that case "location, design, construction, and capacity"—the prepositional phrase modifies each of those conjoined nouns not, say, just the last one in the list. It was in *that* sense that the list is to be treated as a "unit." By analogy, in this case, the prepositional phrase "of any equity security" would modify both "purchase" and "sale," and would mean that both transactions could be "of any equity security." Because the prepositional phrase does not contain any language restricting it to a "class" of equity security, it would seem that this analysis hurts rather than helps Malone's argument.

But, if the statute does not explicitly contain a "same class" requirement, should the Court nonetheless import such a requirement as a judicial gloss? Malone cites language from the landmark Second Circuit case, *Smolowe v. Delendo*[35] stating that to apply Section 16(b) to stocks of different classes would be "beyond the realm of judicial fantasy."[36] For several reasons, that language should not play much of a role in the Court's consideration of this motion. First, *all* the transactions at issue in *Smolowe* were transactions in shares of the issuing corporation's common stock.[37] The footnote language in *Smolowe* is thus dicta since only one class of stock—common stock—was in front of the court in that case.

Second, the language occurred in a portion of the opinion in which the court was considering how to compute "profit" under the statute.[38] It considered, and ultimately rejected, various methods for computing profit including, the specific-identification[39] method and the first-in-first-out[40] method. It's reasonable to assume that, in writing the footnote, the court had in mind the difficulties that would be entailed in the computation of profit when comparing stocks having genuinely different economic characteristics. It is unclear, for example, how one would compute profits in a series of transactions involving common stock and preferred stock, where the classes would typically be materially different in their economics, having different claims on the profits and assets of the enterprise. Whatever those difficulties would be, however, they do not arise with respect to measuring profit[41] in Malone's transactions that involve only voting and non-voting common stock.

Finally, it is worth noting that, while Malone has referred to the voting and non-voting common stock as "classes" of common stock, that is not how Discovery's

---

[35] 136 F.2d 231 (2d Cir. 1943).
[36] *Id.* at n.13.
[37] *Id.* at 234.
[38] *Id.* at 237–39.
[39] *Id.* at 237.
[40] *Id.* at 237-238.
[41] The SEC overcame greater difficulties in providing a method for the calculation of profit when the transactions involve a mixture of transactions in derivative securities and its underlying stock by providing that profit is to be computed using the market price of the underlying stock for transactions in derivatives. 17 C.F.R. §240.16b-6(c)(2). Plaintiff will argue for a similar approach here, using the price of the non-voting common as the least common denominator of the prices of the two stocks.

6

articles of incorporation refer to them.[42]  Discovery's articles distinguish between Discovery's common as one "class" and its preferred stock as a second "class," but within the "Common Stock" class, the voting and non-voting common are distinguished only as "series" within that class. So even if the Court were to adopt Malone's suggestion to read the footnote in *Smolowe* as a definitive statement of the law or to import into Section 16(b) the "class" concepts of Section 16(a), it would do him no good. The footnote speaks of distinct "classes" of stock, not series within a class. And the Second Circuit has held[43] that a "series" within a class was *not* to be treated a separate class for purposes of Section 16(a), so presumably neither would they be so treated for purposes of Section 16(b).

Malone also cites language from the Third Circuit's decision in *Levy v. Sterling Holding Co.*[44] that, in setting forth the elements of a Section 16(b) action, states that the first two elements require "(1) a purchase of a security and (2) a sale of *that* se-

---

[42] Here is the text of Discovery's articles providing for the establishment of its various classes and series of stock:

### ARTICLE IV
### AUTHORIZED STOCK

The total number of shares of capital stock which the Corporation shall have authority to issue is four billion (4,000,000,000) shares, of which three billion eight hundred million (3,800,000,000) shares shall be of a *class* designated as Common Stock, par value $0.01 per share ("Common Stock"), such *class* to be issuable in series as follows:

- a. One billion seven hundred million (1,700,000,000) shares of Common Stock shall be of a *series* designated as "Series A Common Stock" (the "Series A Common Stock");
- b. One hundred million (100,000,000) shares of Common Stock shall be of a *series* designated as "Series B Common Stock" (the "Series B Common Stock");
- c. Two billion (2,000,000,000) shares of Common Stock shall be of a *series* designated as "Series C Common Stock" (the "Series C Common Stock");

and two hundred million (200,000,000) shares shall be of a *class* designated as Preferred Stock, par value $0.01 per share ("Preferred Stock"), such class to be issuable in *series* as follows:

- d. Seventy five million (75,000,000) shares of Preferred Stock shall be of a *series* designated as "Series A Convertible Participating Preferred Stock" (the "Series A Preferred Stock");
- e. Seventy five million (75,000,000) shares of Preferred Stock shall be of a *series* designated as "Series C Convertible Participating Preferred Stock" (the "Series C Preferred Stock" and, together with the Series A Preferred Stock, the "Convertible Preferred Stock"); and
- f. Fifty million (50,000,000) shares of Preferred Stock which are undesignated as to series and are issuable in accordance with the provisions of Article IV, Section D (the "Series Preferred Stock").

COMPLAINT at A-2 to A-4 (emphasis added).

[43] *Ellerin v. Massachusetts Mutual Life Ins. Co.*, 270 F.2d 259 (2d Cir. 1959).

[44] 544 F.3d 493 (3rd Cir. 2008).

curity"[45] as though the issue before the court in *Levy* were the same as the issue here. But, as in *Smolowe*, Malone again relies on judicial dicta to make his case. *Levy* involved the a reclassification of preferred stock into common, which the plaintiff argued was a purchase of common stock, and a later sale of common stock. Both the purchase and sale involved the same class and series of equity securities. The case has nothing to say about the issue in this case. Indeed, if the quotation were taken literally, it would also seem to sanction the concept that the very same stock certificates need be involved in both transactions to come within the bounds of Section 16(b). And since the *Levy* court did not mention that the securities had to be *equity* securities, does that mean that purchases and sales of *debt* securities are covered by Section 16(b)? The saying is true: "A text without a context is a pretext."[46]

### POINT II.
### THE ONLY CASE TO CONSIDER THE QUESTION OF CROSS-CLASS MATCHING UNDER SECTION 16(B) DETERMINED THAT IT IS ALLOWED IF BOTH SECURITIES WERE "EQUITY SECURITIES"

There has been only one federal circuit-level case dealing with the issue of cross-class matching under Section 16(b).[47] That case is *Gund v. First Florida Banks, Inc*,[48] a 1984 Eleventh Circuit case in which the insider sold convertible debentures and bought common stock. The Court in *Gund* upheld the district court's application of Section 16(b) to the transactions and declined Gund's invitation to engage in the "unorthodox transaction" analysis of the Supreme Court's *Kern County*[49] case:

> We have no doubt that section 16(b) literally applies to Gund's transactions. Gund has stipulated to every element of section 16(b) liability. It is undisputed that the transactions were sales and purchases, respectively of the convertible and conversion securities. Gund acknowledges that *they are equity securities* and that he is an insider with respect to First Florida. The sales and purchases were never separated by more than one day and were sometimes simultaneous. There is simply, no ambiguity to resolve. ··· Since there is no ambiguity as to whether the literal language of section 16(b) applies to these transactions, any contention by Gund that the statute should not encompass his 1976 and 1977 sales and

---

[45]DEFENDANT MALONE'S MEMORANDUM IN SUPPORT at 1–2, 7 (quoting *Levy* at 496, emphasis added by Malone).

[46]S. Gawiser and G. Witt, A JOURNALIST'S GUIDE TO PUBLIC OPINION POLLS at 111 (Praeger, 1994) (quoting Jesse Jackson, who is quoting D.A. Carson, who in turn is quoting his father).

[47]The district court in the Western District of New York also held an insider liable for cross-class matching, *Chemical Fund, Inc. v. Xerox Corp.*, FED. SEC. L. REP. ¶¶91,653 (W.D.N.Y.1966), but that decision was overturned on other grounds by the Second Circuit, *Chemical Fund, Inc. v. Xerox Corp.*, 377 F.2d 107 (2d Cir. 1967).

[48]726 F.2d 682 (11th Cir. 1984).

[49]*Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973).

purchases must be made to Congress, not to the courts.[50]

The debentures at issue in *Gund* were convertible into common at $12 per share,[51] but Gund's transactions took place at time when the common stock was trading at around $6 per share. Gund argued that the conversion feature therefore had little or no impact on the trading prices of the debentures.[52] But it was not comparability of prices that made the conversion feature significant. What made the conversion feature significant was that it made the debentures into *equity securities*, whereas they would have been merely debt securities not subject to Section 16(b) without it.[53] And because they were equity securities, they came, as the *Gund* court pointed out within the literal terms of Section 16(b).

Malone argues[54] that his transactions are outside the scope of Section 16(b), in part at least, because neither the voting nor non-voting common stock is convertible into the other. But this is a serious confusion of what it takes to be an "equity security." Section 3(a)(11) defines an equity security as

> any stock or similar security; or any security future on any such security; or any security convertible, with or without consideration, into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right; or any other security which the Commissioner shall deem to be of similar nature and consider necessary or appropriate, by such rules and regulations[55] as it may prescribe in the public interest or for the protection of investors, to treat as an equity security.[56]

There are many ways in which a security can qualify as an equity security, and having a conversion feature is just one of them. If a security is a "stock or similar security" in its own right, as Discovery's voting and non-voting common stocks surely are, there is no need to *also* have a conversion feature to qualify as an equity security. In *Gund*, the conversion feature was necessary to make the debentures equity securities; in this case it is not.

---

[50]*Gund* at 687 (emphasis added, citations omitted).
[51]*Id.* at 684.
[52]*Id.* at n.4.
[53]*Chemical Fund*, *supra* at 110 ("it is apparent that a Convertible Debenture is an 'equity security' only because of its convertible nature.").
[54]Defendant Malone's Memorandum in Support at 10–14.
[55]The Commissioner has used this authority to expand the definition of equity securities to include stock options, even though they are not issued by the issuer. 17 C.F.R. §240.3a-11.
[56]15 U.S.C. §78c(a)(11).

9

## POINT III.

### THE PRICES OF DISCOVERY'S VOTING AND NON-VOTING STOCK ARE SO HIGHLY CORRELATED THAT AN INSIDER'S KNOWLEDGE OF THE FUTURE PRICE PROSPECTS OF ONE OF THEM PROVIDES THE INSIDER WITH A HIGH DEGREE OF INFORMATION ABOUT THE FUTURE PRICE PROSPECTS OF THE OTHER.

Malone argues at length that the pricing of Discovery's voting and non-voting common stocks are so much at variance that to match them under Section 16(b) would be unthinkable.[57] However, as the graph of the share prices of the two stocks attached to the complaint[58] demonstrates, the prices of the two stock follow each other with visible regularity, just as one would expect, *a priori*, of two common stocks representing equity in the same enterprise. It is no answer to point out the occasional pricing anomaly, as Malone does,[59] since while markets are surely efficient, they are concededly not *perfectly* efficient. What is required under Section 16(b) is not that the two stocks move in tick-by-tick unison, but that their prices follow one another over time horizons measured in days, weeks, and months. That is all it takes to present an insider the opportunity to exploit inside information.[60] Indeed, the statute sets an upper bound on this period at six months.

But there is a widely-accepted objective way to measure the degree to which two stock prices move together, namely the so-called "scatter plot."[61] Where the correlation between the prices of two stocks, or any two variables for that matter, needs to be visualized, statisticians plot them together on the same set of axes. In particular, they would plot the points formed by using the closing price of one stock as an *x*-coordinate and the closing price of the other stock as a *y*-coordinate. If points are plotted for these prices over a long period, stocks that tend to follow one another will result in a scatter plot that clusters around a line to a greater or lesser extent, depending on the degree of correlation between the two prices.[62] For example, the scatter-plot in Figure 1(a), shows that the prices of two arbitrarily-chosen stocks, AT&T and Apple,[63] exhibit very little tendency to move together. Yet in Figure 1(b) the prices of Discovery's voting and non-voting common stocks line up in a compact formation around a line, revealing the high degree to which their movements track

---

[57] DEFENDANT MALONE'S MEMORANDUM IN SUPPORT at 14–17.

[58] COMPLAINT Schedule III at III-2.

[59] DEFENDANT MALONE'S MEMORANDUM IN SUPPORT at 16.

[60] *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 424 (1972) ("To be sure, where alternative constructions of the terms of §16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders."); *Kern County*, *supra* at 595.

[61] Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 134–138 (West 2000).

[62] *Id.*

[63] The Court may take judicial notice of the prices of publicly-traded stocks. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 at n.8 (2d Cir. 2000). The plots appearing below are simply a mechanical arrangement of those judicially noticeable prices.

one another.



Figure 1: *Scatter plots of prices from October 1, 2008, through October 1, 2010, of (a) AT&T Common vs Apple Common and (b) Discovery's Voting and Non-Voting Common. Source: Wolfram Research, curated stock market databases.*

The opportunity to exploit this is obvious. If one had access to information about where Discovery's *voting* common stock would be trading, say, three weeks hence, one could use that information to profit by buying or selling *non-voting* common stock with a high degree of confidence that its price would track the voting stock's price. For example, suppose an insider knew that, in two months time a favorable acquisition by the company were going to be announced that would result in a 20% increase in the price of the voting stock. Knowing that this almost certainly means a 20% increase in the price of non-voting stock will happen as well, an insider could purchase voting shares at the current uninformed public price and, after the acquisition were made known to the market, sell some of his inventory of non-voting stock. All that would be necessary to make a *cash* profit is that the price increase be sufficient to overcome the vote premium, which, while variable, varies within a tightly predictable range. And even if the increase were not sufficient to outstrip the vote premium, the insider would have acquired additional votes for nothing, or in any event at a discount from market.

POINT IV.

PERMITTING SHORT-SWING TRADING BETWEEN VOTING AND
NON-VOTING COMMON STOCK WOULD MAKE EVASION OF
SECTION 16 TRIVIALLY EASY.

Finally, by holding as Malone has suggested that Section 16(b) permits short-swing trading in voting and non-voting common stock, the Court would invite easy evasion of the statute's short-swing trading provisions. In its 1944 report to Congress, the SEC summarized the motivation for the enactment of Section 16(b):

> Prior to the enactment of [Section 16(b)] profits from 'sure thing' spec-

> ulation in the stocks of their corporations were more or less generally accepted by the financial community as part of the emolument for serving as a corporate officer or director notwithstanding the flagrantly inequitable character of such trading[64]

To hold that Malone's transactions are not subject to Section 16(b), would be to emasculate its protection against such "sure thing" speculation. Why would not every major corporation create two classes of common and provide its officers and directors with a strategic blend of both kinds of stock? Or why not pay stock-based compensation in voting common, freeing them to sell, with no restrictions whatsoever, shares of non-voting common? Under the interpretation of Section 16(b) advocated by Malone, these sorts of "planning" opportunities would become commonplace, and the emoluments Congress thought it had banished would be upon us again.

---

[64] 10 SEC Annual Report 50 (1944).

## Conclusion

BASED ON THE FOREGOING POINTS AND AUTHORITIES, Plaintiff asks the Court to hold as a matter of law that Section 16(b) provides for the matching of transactions in the two publicly-traded equity securities of Discovery and, therefore, to DENY Malone's motion to dismiss its complaint for failure to state a claim for which relief may be granted.

Respectfully submitted,

/s/ Daniel E. Doherty
................................................
DANIEL E. DOHERTY, ESQ. (Pro Hac Vice)
LAW OFFICES OF DANIEL E. DOHERTY
7300 W. 110th Street, Suite 930
Overland Park, KS 66210
**Phone:** 913.338.7182
**Fax:** 913.338.7164
**Email:** ded-law@ddoherty.net


/s/ Charled J. Hyland
................................................
CHARLES J. HYLAND, ESQ. (CH-2561)
HYLAND LAW FIRM LLC
7300 W. 110th Street, Suite 930
Overland Park, KS 66210
**Phone:** 913.498.1911
**Fax:** 913.498.1950
**Email:** charlie@hylandkc.com

ATTORNEYS FOR PLAINTIFF

## Certificate of Service

I hereby certify that I have, on the date set forth above my signature, served copies of the foregoing *Plaintiff's Brief in Opposition to Defedant's Motion to Dismiss* upon the below-listed individuals by filing the foregoing document with the Court's CM/ECF system, of which I believe all the following are participants.

SETH T. TAUBE, ESQ.
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112
**Phone:** 212.408.2655
**Fax:** 212.408.2455
**Email:** seth.taube@bakerbotts.com
Attorney for John C. Malone

CHRISTOPHER W. CARRION, ESQ.
WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
**Phone:** 212.230.8800
**Fax:** 212.230.8888
**Email:** christopher.carrion@wilmerhale.com
Attorney for Discovery Communications, Inc.

JOHN F. BATTER, ESQ.
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
**Phone:** 617.526.6000
**Fax:** 617.526.5000
**Email:** john.batter@wilmerhale.com
Attorney for Discovery Communications, Inc.

Executed on: *February 25, 2011*

/s/ Daniel E. Doherty
...............................................
Daniel E. Doherty, Esq.