IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL D. GIBBONS, | ) |
| Plaintiff, | ) |
| v. | ) No. 10 Civ. 8640 (BSJ) |
| JOHN C. MALONE, | ) |
| Defendant | ) |
| and | ) |
| DISCOVERY COMMUNICATIONS, INC. | ) |
| Nominal Defendant | |

# REPLY IN SUPPORT OF
# DEFENDANT JOHN C. MALONE'S MOTION TO DISMISS

## INTRODUCTION

Plaintiff takes the position that Section 16(b) requires disgorgement of profits if a statutory insider sells *any one* equity security and purchases *any other* equity security of the same issuer. Pl.'s Br. In Opp'n to Def.'s Mot. to Dismiss ("Opposition" or "Opp'n") at 6. The absurdity of that interpretation is demonstrated by the fact that Plaintiff himself *does not believe it*. Though Plaintiff initially adopts this sweeping interpretation of Section 16(b), he ultimately retreats from his radical reading and instead contends that disgorgement of profits is required if the equity securities at issue are sufficiently similar that their sale and subsequent purchase create "the opportunity to exploit insider information." *Id.* at 10. Aside from being flatly inconsistent with the statutory language, that interpretation imposes an unworkable standard that ignores Congress's objective to create a clear and easily administered rule, a critical legislative intent that goes unmentioned throughout Plaintiff's Opposition.

Disregarding statutory text and purpose, Plaintiff's primary rationalization for his reading of Section 16(b) seems to be that his interpretation will more effectively curb insider abuse. Opp'n at 10–12. That concern is a red herring: It overlooks the myriad other remedies that Congress and the SEC have created to target insider trading — remedies that address Plaintiff's stated concern but, again, get no mention in his Opposition.

As explained in Mr. Malone's Memorandum of Law ("Memorandum" or "Mem."), the only reading of Section 16(b) that comports with the text, purpose, and longstanding interpretation of the statute is one that limits its reach to purchases and sales of the same equity security, or securities that can be converted into, or exercised for, each other or a third common equity security. Mem. at 8–14. In this case, the transactions at issue involve *different* equity securities that carry *different* rights and constitute legally different classes. The securities are not

1

convertible or exercisable, and they do not give the holder the right to acquire any other security at a fixed price. Given those indisputable facts, Section 16(b) does not apply as a matter of law. To apply the statute to these mismatched transactions would represent a dramatic expansion of the law under Section 16(b) and invite a wave of lawsuits that have nothing to do with the class of transactions Congress intended the statute to reach.

## I  PLAINTIFF'S UNPRECEDENTED READING OF SECTION 16(b) IGNORES THE TEXT, PURPOSE, AND LONGSTANDING INTERPRETATION OF THE STATUTE

### A.  Plaintiff's Broad Interpretation Is Wrong, As He Himself Recognizes

Plaintiff initially contends that Section 16(b) applies to the purchase of *any one* equity security and the sale of *any other* equity security of the same issuer. Opp'n at 6. That expansive interpretation is plainly incorrect. Plaintiff himself acknowledges that it would make no sense to say that profit is earned where an insider buys the common equity of an issuer then sells that issuer's non-convertible preferred equity. *Id*. But the logical import of Plaintiff's broad reading is that such transactions would require matching under the statute.

Plaintiff's interpretation not only leads to admittedly incorrect results, it also cannot be reconciled with the statutory language. As explained in the Memorandum, the language and structure of Section 16(b)'s text make clear that, in order for transactions to be matched, an insider's "purchase and sale" must both be directed at the same prepositional object — *i.e.*, the same "equity security." Mem. at 8. The statute does not say the "purchase of any equity security" and the "sale of any equity security." Rather, it conjoins "purchase and sale" into a "single compounded unit," making clear that the insider's purchase *and* sale must be directed at

2

the *same* "equity security."  *See ConocoPhillips Co. v. EPA*, 612 F.3d 822, 838–839 (5th Cir. 2010); Mem. at 8.[1]

Not a single court has ever read Section 16(b)'s use of the "any" modifier the way Plaintiff does.  To the contrary, the Second Circuit has explained that Section 16(b)'s use of "any" is meant to signify one thing:  that disgorgement is required for the purchase and subsequent sale (or vice versa) of shares of "any" one type or kind of equity security. *Ellerin v. Mass. Mut. Life Ins. Co.*, 270 F.2d 259, 263 (2nd Cir. 1959) ("It is much more natural, we think, to read 'any equity security' [in Section 16(a)] as referring to the kind or nature of the security . . . . [N]o security is excluded no matter how like debt it is.").

The courts and the Commission have also made clear that (notwithstanding the "any" modifier) Section 16(b) is limited to transactions that involve the same equity security or securities that are convertible into or exercisable for one another or a third equity security.  *See, e.g.*, *Smolowe v. Delendo Corp.*, 136 F.2d 231, 237 n.13 (2d Cir. 1943); *Levy v. Sterling Holding Co.*, 544 F.3d 493, 496 (3d Cir. 2008); SEC Release No. 34-28869, 1991 WL 292000, at *17; Mem. at 8–14.[2]  Plaintiff's interpretation would discard all of that authority and would contradict

---

[1] The notion that the "purchase and sale" referenced in Section 16(b) could be directed at *different* securities because "any" appears before "equity security" is belied by the following example.  If one uttered the sentence, "*The rise and fall of <u>any</u> great empire would make a suitable subject for a graduate thesis,*" no one would take this as guidance to prepare a paper on the rise of the Incas and the fall of the Romans.  Instead, one would understand this to mean that a suitable thesis might cover the rise and fall of the *same* great empire, with no limitations on which particular empire is addressed.

[2] Plaintiff dismisses as dictum the Second Circuit's pronouncement in *Smolowe* that applying Section 16(b) to cross-class transactions "is beyond the realm of judicial fantasy," 136 F.2d at 237 n.13, but in fact this determination was key to the court's reasoning.  That case presented the question of whether the exact same stock certificate had to be purchased and sold to trigger disgorgement. *Id.* at 237.  The scope of Section 16(b) was therefore undeniably before the court.  And, as part of its conclusion that the statute *was* broad enough to cover transactions involving different stock certificates, the court was careful to note the limit of its holding: that Section 16(b) is *not* broad enough to reach transactions across *different* classes of stock. *Id.* at 237 n. 13.

3

SEC Rules excluding from Section 16(b)'s coverage convertible or exercisable securities "with an exercise or conversion privilege at a price that is not fixed." *See* 17 CFR §§ 240.16a-1(c)(6), 240.16b-6(a); SEC Release No. 34-28869, 1991 WL 292000, at *11–17.  The word "any" in the statute simply does not do the work Plaintiff contends.

### B. Plaintiff's Back-Up Position Regarding The Scope Of The Statute Has No Legal Basis And Would Destroy Section 16(b)'s Bright-Line Rule

Plaintiff's alternative reading of the statute — as applying to any transactions that create "an opportunity to exploit insider information," Opp'n at 6 — is equally unavailing.  The Second Circuit has "reject[ed] [a plaintiff's] attempt to bring [a] transaction within the ambit of Section 16 by invoking the policy argument that it is the type of speculative, short-term profit-taking the statute was designed to prevent."  *Gwozdzinsky v. Zell/Chilmark Fund*, 156 F.3d 305, 310 (2d Cir. 1998) (affirming summary judgment for defendant where plaintiff sought disgorgement of profits realized under standby purchase agreements in connection with pro rata rights offerings by the issuer).  Not only has Plaintiff's approach been rejected by the Second Circuit, it would eviscerate Congress's purpose in enacting the statute:  to provide a "flat," easily administered rule that captures those transactions most likely to involve insider abuse while, at the same time, giving courts and statutory insiders clear guidance on which transactions will trigger disgorgement and which will not.  *See, e.g.*, *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972).

---

When, in dictum, an appellate court "provid[es] a construction of a statute to guide the future conduct of inferior courts," that dictum "must be given consideration and weight" and may not be "cavalierly disregard[ed]."  *Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620, 625 (S.D.N.Y. 2010) (following dicta in Supreme Court opinion construing Section 10(b) of Securities Exchange Act of 1934) (quoting *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975)).

4

REPLY IN SUPPORT OF DEFENDANT
JOHN C. MALONE'S MOTION TO DISMISS

Plaintiff wholly ignores this well-recognized Congressional purpose, *see* Mem. at 18–22, and in doing so offers no explanation for how courts could possibly implement the *non*-standard he advocates.  He gives no indication as to how courts, or statutory insiders, might determine whether two different securities are sufficiently similar to trigger disgorgement under Section 16(b), let alone how a court might calculate the insider's profits.  Instead, Plaintiff proposes that courts and insiders study scatter plots and trading records and, based on that, try to determine whether securities appear to share trading patterns sufficiently comparable to create a risk of insider abuse.  Opp'n at 10–11.  Plaintiff's "know-it-when-you-see-it" approach provides no standard at all and cannot be a basis for imposing strict-liability disgorgement.  *See* Mem. at 21–22.

## II. IT IS CLEAR FROM THE PLAINTIFF'S COMPLAINT THAT MR. MALONE'S TRANSACTIONS FALL OUTSIDE THE SCOPE OF SECTION 16(b)

Properly interpreted, Section 16(b) requires disgorgement *only* where transactions involve the same securities or securities that are properly treated as such:  *i.e.*, securities that are convertible into, or exercisable for, each other or a third, common security.  *See* Mem. at 8–14; *see supra* 2–4.  Under that proper interpretation, which Plaintiff cannot effectively refute, the Complaint must be dismissed.

### A. Because Mr. Malone Purchased And Sold Different Securities, They Cannot Be Matched Under The Statute

The Complaint acknowledges that the securities that Mr. Malone purchased and sold are different securities that carry different rights and constitute different classes of stock.  Compl. ¶¶ 14, 21, 23; *see Gryl ex rel. Shire Pharms. Group v. Shire Pharms. Group*, 298 F.3d 136, 140 (2d Cir. 2002) (allegations in complaint must be taken as true).  In his Opposition, Plaintiff backs away from that acknowledgment, suggesting that the securities at issue constitute the same class and that therefore matching is proper.  *See* Opp'n at 6–7.

5

Plaintiff was right the first time: class A and class C, which have fundamentally different voting rights, are undeniably different securities, which means that, under the plain terms of Section 16(b), they cannot be matched.  Mem. at 7–8.  These securities also undeniably occupy legally distinct classes, as an abundance of authority makes clear.  *See, e.g., Morales v. New Valley Corp.*, 936 F. Supp. 119, 125 (S.D.N.Y. 1996) (two nominal classes with different voting rights could not be treated as a single class for purposes of Section 16(a)), *aff'd, Morales v. Freund*, 163 F.3d 763 (2d Cir. 1998); Crawford & Co., SEC No-Action Letter, Fed. Sec. L. Rep. (CCH) ¶ 79,673, 1991 WL 178739 at *1 (Apr. 19, 1991); Jevic Transportation, Inc., SEC No-Action Letter, 1999 WL 232603 at *1 (Apr. 20, 1999); Mem. at 10–11.  That fact confirms that Section 16(b) has no application here.

Now, recognizing the limits on Section 16(b)'s reach, Plaintiff tries to shoehorn the securities Mr. Malone purchased and sold into the same class by noting that Discovery's Restated Certificate of Incorporation "distinguish[es]" class A and class C "only as 'series' [of stock] within [the same] class."  Opp'n at 7.  But those corporate labels do not change the fact that class A and class C shares are different *securities* and therefore not matchable under the statute.  In any event, the Second Circuit has made clear that "corporate labels are not necessarily binding on the court" in determining whether two stocks occupy the same class for Section 16.  *Ellerin*, 270 F.2d at 265.[3]  That principle has particular force where, as here, the securities at issue carry different voting rights, a fact that places them in legally distinct classes, and where Plaintiff acknowledges in his Complaint that they occupy separate classes.

---

[3] In *Ellerin*, the Second Circuit held that two categories of preferred stock qualified as series within a class because, among other things, they had nearly identical voting rights.  270 F.2d at 265.  That holding provides no support for treating Discovery's class A and class C shares — which have fundamentally *different* voting rights — as constituting a single class.

Whatever "corporate labels" Discovery may have chosen to use, the bottom line is that the A and C securities are different equity securities that not only carry fundamentally different rights but also trade differently in the market.  Those facts are plain from the face of the Complaint and more than sufficient to put Mr. Malone's transactions outside the reach of Section 16(b).  Plaintiff tries to downplay the divergences in class A's and class C's trading patterns.  But the fact that class A and class C shares moved in opposite directions fifteen out of the eighty-two days covered by Plaintiff's price history — more than eighteen percent of the time — is obviously more than an "occasional pricing anomaly."  Opp'n at 10.

Plaintiff also ignores that the price of class C shares on several days closed higher than the price of class A shares, a fact that destroys his claim that the only economically material difference between the two classes is that class A shares are voting and class C shares are not.  *See* Compl. ¶ 45; Mem. at 17.  He likewise fails to grapple with the fact that an options market exists for class A, but not class C, shares — another economically meaningful distinction that (among others) almost certainly contributes to the two securities' different trading patterns.  Mem. at 16.  Also missing from Plaintiff's argument is the fact that the difference between the prices of the two classes is neither constant nor predictable.  *Id.* at 15–16.  All of these facts are undisputed and undercut Plaintiff's contention that one enjoys an easy opportunity to exploit inside information in trading between class A shares and class C shares.  *See id.* at 14–17.

Finally, Plaintiff's unsurprising observation that the price history of these two Discovery securities is more similar than the price history of two stocks from two different companies in two different industries, Opp'n at 11, proves absolutely nothing.  The same is true of his observation that the prices of class A and class C shares follow similar trends over a period of "days, weeks, and months."  *Id.* at 10.  That similarity is likely to exist for any two securities of

7

the same issue and, as even Plaintiff acknowledges, is insufficient to create matching transactions under Section 16(b), Opp'n at 6.

### B. The Interpretation Of Section 16(b) To Cover Transactions Involving Derivatives Provides No Basis For Granting Relief Here

Plaintiff's reliance on *Gund v. First Florida Banks, Inc.*, 726 F.2d 682 (11th Cir. 1984), to try to justify an expansion of Section 16(b) is misplaced. That case addressed a question entirely different than the one presented here: namely, "whether the sale by an insider of a convertible security, followed within six months by the purchase of the underlying conversion security, constitutes a short-swing transaction controlled by section 16(b)." *Id.* at 683. The Eleventh Circuit answered "yes." *Id.* at 687 (holding that the statute encompasses Gund's sales of the issuer's "convertible and conversion securities"). As the Commission later explained, *Gund* was one of a series of cases applying Section 16(b) to transactions involving derivatives and their underlying securities, a result that makes sense since "[h]olding derivative securities is functionally equivalent to holding the underlying equity security." SEC Release No. 34-28869, 1991 WL 292000, at *11–19 and n.106 (citing *Gund*, 726 F.2d 682); Memo at pp. 11–12.

Nothing about *Gund*, or the reasoning that explains it, provides any support for applying Section 16(b) here. Mr. Malone's transactions did not involve derivatives and their underlying securities, which the Commission defines as being in the same class, 17 C.F.R. § 240.16a-4(a). Rather, his transactions involved different securities that occupy concededly *different* classes, Compl. at ¶¶ 14, 21, 23, and are not convertible into or exercisable for each other or a third security. The purchase of class A shares does not give the buyer any right to acquire class C shares, let alone at a fixed price, or vice versa, For that reason, purchasing one is *not* the functional equivalent of purchasing the other. Those simple facts, plain from the face of the Complaint, mean that Section 16(b) does not apply as a matter of law.

8

### III. PLAINTIFF'S STATED CONCERN ABOUT INSIDER ABUSE CANNOT JUSTIFY EXPANDING SECTION 16(b) BY JUDICIAL FIAT

Ultimately, Plaintiff's position comes down to this: Failure to apply Section 16(b) to Mr. Malone's transactions would leave open the door to various forms of alleged insider abuse. *See* Opp'n at 10–12. That policy argument is no basis for reading the statute beyond its plain terms. *See Gwozdzinsky*, 156 F.3d at 310. And it ignores entirely the numerous remedies beyond Section 16(b) that are aimed at addressing insider trading.

According to Plaintiff, what triggers — or, in his view, *should* trigger — potential liability under Section 16(b) is whether an insider's transactions provide "the opportunity to exploit insider information." Opp'n at 10. As the Supreme Court has admonished, however, the text of Section 16(b) "cannot be disregarded simply on the ground that it may be inconsistent with our assessment of the 'wholesome purpose' of the [statutory provision]." *Reliance Electric Co.*, 404 U.S. at 424. In *Reliance*, the defendant purchased slightly more than thirteen percent of a company's stock. *Id.* at 420. Within six months, the defendant sold its entire stake in the company, but did so in two transactions, the first of which brought its share down to just below ten percent of the company's stock. *Id.* The Court held that only profits from the first sale were subject to disgorgement because at the time of the second sale, the defendant held less than ten percent and therefore was not an insider. *Id.* at 423–24.

The dissent took issue with this conclusion, observing that it would allow an insider to avoid disgorgement simply by using this split-sale technique. *Id.* at 431–32. The majority acknowledged this effect, but held it provided no basis for reading the statute contrary to terms Congress chose to use. *Id.* at 423–24. Here, too, Plaintiff insists that a plain (and plainly correct) reading of Section 16(b) would invite "strategy" and "planning" to avoid matching

9

under Section 16(b). Opp'n at 12. Even if that concern were well-founded, it cannot justify expanding liability under the statute, as *Reliance* and other cases make clear.[4]

In any event, the concern expressed by Plaintiff is *not* well-founded. His Opposition completely disregards that Section 16(b) is only *one* of a wide arsenal of statutes and regulations aimed at deterring insider trading. *See* Mem. at 23. The notion that abusive speculation will go unaddressed unless this Court adopts, for the first time, an unprecedented interpretation of the narrow remedy provided by Section 16(b) — one that flatly contradicts both statutory text and purpose to extend the statute to an entirely new category of transactions — is simply specious.

## CONCLUSION

For reasons stated above and in his Memorandum of Law, Mr. Malone respectfully requests that the Court grant his motion.

Dated: March 18, 2011

Respectfully submitted:

BAKER BOTTS L.L.P.

By: /s/ Seth Taube
    Seth Taube (6088)
    30 Rockefeller Plaza
    New York, New York 10112
    Tele: (212) 408-2500
    Fax: (212) 408-2501
    seth.taube@bakerbotts.com

*Attorneys for John C. Malone*

---

[4] As the Court explained in *Reliance*, "Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under [Section] 16(b)." 404 U.S. at 422. For a summary of other judicially approved methods of planning around the statute, including crossing the ten percent threshold in a single purchase, pledging or gifting shares rather than selling them, and changing the form of a transaction, *see* Peter Romeo & Alan Dye, *Section 16 Treatise & Reporting Guide* § 9.01 at 786–89.

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of March 2011, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court, Southern District of New York and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Seth T. Taube<br>
Seth T. Taube